FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 0 4 2016

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

| | |
|---|---|
| KENNETH DEWAYNE IVY | PLAINTIFF |
| VS.    NO. 3:15-CV-166-DPM | |
| UNION PACIFIC RAILROAD COMPANY | DEFENDANT/THIRD-PARTY PLAINTIFF |
| VS. | |
| RICELAND FOODS, INC. | THIRD-PARTY DEFENDANT |

### THIRD-PARTY COMPLAINT AGAINST RICELAND FOODS, INC.

COMES NOW, Union Pacific Railroad Company ("Union Pacific"), and for its Third-Party Complaint, states:

**I.      PARTIES AND JURISDICTION.**

1.      Kenneth Ivy ("Plaintiff") is an individual residing in and domiciled in Thornton, Colorado.

2.      Union Pacific ("Third-Party Plaintiff") is a Delaware corporation with its principal place of business in Nebraska.

2.      Riceland Foods, Inc. ("Riceland" or "Third-Party Defendant") is an Arkansas corporation with its principal place of business in Stuttgart, Arkansas.    Riceland also does business in Craighead County, Arkansas. Riceland was the employer of Plaintiff at the time of Plaintiff's injury.

3.      This Court has subject matter jurisdiction over this Complaint and personal jurisdiction over Riceland.  Venue is proper.

## II.   FACTUAL ALLEGATIONS.

4.      Third-Party Plaintiff Union Pacific restates and re-alleges each allegation made above as if set forth fully herein.

5.      On June 16, 2015, Plaintiff Kenneth Ivy brought the Original Complaint against Union Pacific, alleging negligence and liability under the Federal Employers Liability Act ("FELA") arising out of an accident occurring on November 20, 2013.

6.      As alleged by Ivy, he working as a Riceland Track Mobile Operator on November 20, 2013 in the Riceland rail yard property located at or around 216 G Street, Jonesboro, Arkansas. (Original Complaint, ¶¶ 13—18)

7.      As alleged by Ivy, he was "the victim of an accident involving a train car in which he lost or severely damages three of his four limbs and lost large amounts of skin from his torso." (Original Complaint, ¶17)

8.      Specifically, on November 20, 2013, Ivy and a fellow Riceland employee were engaged in the switching of rail cars.  They were utilizing a track mobile, owned or leased to Riceland, to switch the rail cars.  Ivy or another Riceland employee had set railcar UP 93785 out onto a Riceland track that was on an incline.  UP 93785 began to roll down the track.  Ivy tried to set the handbrake as the car was rolling, and tripped in the process.

## III.   CONTRACTUAL INDEMNITY OWED BY RICELAND.

9.      Third-Party Plaintiff Union Pacific restates and re-alleges each allegation made above as if set forth fully herein.

10.     Union Pacific and Riceland's predecessors-in-interest entered into an Agreement dated September 30, 1977, covering the maintenance and operation of the tracks at the Riceland

property in Jonesboro.  *See* Exhibit 1, attached hereto.  This Agreement applies to the relationship between Union Pacific and Riceland.

11.     Section 16 of the Agreement provides, in part:

> . . . Industry [Riceland] shall indemnify, protect, and save harmless Railroad from and against all loss, damages, cost, and expense and consequence of death of or injury to persons, whomsoever. . . in any manner caused by, resulting from, or incidental to the existence, maintenance, use or operation of engine or track mobile, or the movement by industry, its agents, servants or employees, of any car or cars on track, or Industry's failure to place and keep engine and track mobile as hereinabove provided, or by reason of Industry's failure to set the brakes or block the wheels of any car or cars after movement thereof by Industry, its agents, servants or employees regardless of the negligence of the Railroad.

12.     Riceland has accepted the indemnity of Union Pacific without reservations. Union Pacific is entitled to indemnity and contribution from Riceland, and to have a judgment to that effect.

## CAUSE OF ACTION: ALLOCATION OF FAULT (APPORTIONMENT) AND CONTRIBUTION.

13.     Third-Party Plaintiff Union Pacific restates and re-alleges each allegation made above as if set forth fully herein.

14.     The General Assembly for the State of Arkansas has enacted Act 1116, entitled "An Act to Clarify the Meaning of the Uniform Contribution Among Tortfeasors Act; and For Other Purposes." Act 1116 is now in the law of the State of Arkansas and applies to this action. Section 8 of Act 1116 of 2013. The Civil Justice Reform Act of 2003 (Act 649) also applies to this action.

15.     Third Party Defendant Riceland, Inc. is a joint tortfeasor for the purposes of the right of allocation of fault, or "contribution" as defined by Act 1116. Union Pacific has the right to add Third Party Defendant Riceland as a party to this matter for purposes of the right of allocation of fault. The negligence, fault, and responsibility of Third Party Defendant Riceland must be determined and apportioned so that the several liability of Union Pacific can be determined.

16.     While continuing to deny that Union Pacific engaged in any negligence conduct with respect to the November 20, 2013 accident, and while continuing to deny any liability arising from such accident, Union Pacific asserts that it is entitled to contribution and/or allocation of fault from Riceland.

17.     Riceland was negligent in the following regards:

A.      by violating the General Duty Clause of Occupational Safety and Health Act ("OSHA"), which provides that "[e]ach employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are likely to cause death or serious physical harm to his employees. . . ." 29 U.S.C. § 654;

B.      by failing to adequately train Ivy and other employees;

C.      by failing to employ safe work practices;

D.      by failing to provide and require use of personal protective equipment, such as a flashlight;

E.      by otherwise failing to provide a safe place to work;

F.      by violating Arkansas Code Annotated Section 11-2-117 (a), which provides that "[e]very employer shall furnish employment that is safe for the employees therein

and shall furnish and use safety devices and safeguards. The employer shall adopt and use methods and processes reasonably adequate to render such an employment and place of employment safe and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of the employees";

      g.     by violating the Arkansas Department of Labor Basis Safety Manual, including but not limited to the following violations:

      i.     Failure to train and instruct the workers;

      ii.     Failure to have careful safety-minded supervision;

      iii.     Failure to insure orderly procedure and use of safe methods of operation;

      iv.     Failure to have proper and adequate personal protective equipment;

      v.     Failure to practice good housekeeping; and

      vi.     Failure to have adequate and proper illumination.

18.     Union Pacific is thus entitled to have Riceland on the verdict form so that the jury can determine the allocation of fault of the parties so that the several liability of Union Pacific, if any, can be determined.

## **JURY DEMAND**

19.     Union Pacific demands a jury trial for all appropriate issues.

WHEREFORE, PREMISES CONSIDERED, Union Pacific Railroad Company respectfully requests an allocation of fault by the jury for third Party Defendant Ricleand, Inc., for its attorneys' fees and costs, and for all other relief to which it is entitled.

Respectfully submitted,

James C. Baker, Jr., #86009
Jamie Huffman Jones, #2003125
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue
Suite 2000
Little Rock, Arkansas 72201-3522
(501) 370-1430 - Telephone
(501) 244-5340 - Facsimile
baker@fridayfirm.com – Email
jjones@fridayfirm.com – Email
*Attorneys for Defendant Union Pacific Railroad*
*Company*

By: _____
Jamie Huffman Jones

## CERTIFICATE OF SERVICE

I, Jamie Huffman Jones, hereby certify that a copy of the foregoing has been served upon the following counsel of record on this 4th day of May, 2016:

Josh Sanford
Christopher Burks
Sanford Law Firm, PLLC
650 S. Shackleford, Suite 411
Little Rock, AR 72211
josh@sanfordlawfirm.com
chris@sanfordlawfirm.com

Jason T. Brown
Michael G. Radigan
JTB Law Group, LLC
155 Second Street, Suite 4
Jersey City, NJ 07302
jtb@jtblawgroup.com
michaelradigan@jtblawgroup.com

Lawrence Mann
Alper & Mann, P.C.
9205 Redwood Avenue
Bethesda, MD 20817
lm.mann@verizon.net

_____
Jamie Huffman Jones

6

C.S. 1382-E

## DOCUMENT COVER

ENTERED INTO
RELMIS

_6-9-78 (26) NB_

SSW
DOCUMENT
DIT No.
T 7208 N

Accounting Department Number

## NOTICE

**This document must be kept intact.** No check marks or notations of any kind should be made on the instruments.

It is important that integrity of this document be preserved and care should be taken to avoid disarrangement or loss of papers included herein.

Should inspection or copying of any instrument require its removal from the file, permission for such removal must be obtained from Manager, Equipment and Miscellaneous Accounting (Document Custody Bureau).

This document must be given fire protection overnight.

Return the document promptly to Manager, Equipment and Miscellaneous Accounting (Document Custody Bureau).

**EXHIBIT 1**

*Document Audit No. SSW T-7208*

*TC T-125.26-R*
*26      N*

THIS AGREEMENT, made this *30th* day of

*September*, 197 *2*, by and between ST. LOUIS

SOUTHWESTERN RAILWAY COMPANY ("Cotton Belt"), a corporation,

and ST. LOUIS - SAN FRANCISCO RAILWAY COMPANY ("Frisco"),

a corporation, hereinafter collectively called "Railroad", and

ARKANSAS RICE GROWERS COOPERATIVE ASSOCIATION, a corporation,

d/b/a Riceland Foods, P. O. Box 681, Stuttgart, Arkansas 72160,

hereinafter called "Industry";

RECITALS:

The parties hereto desire to evidence their under-
standings and agreements with respect to the mainte-
nance and operation of industrial track facilities,
hereinafter called "Track", described as follows:

Tracks, approximately 21,653 feet in length, at or
near Jonesboro Station, County of Craighead, State
of Arkansas, illustrated on the map attached and
hereby made a part hereof, marked Exhibit "A".

NOW, THEREFORE, in consideration of the agreements herein-

after contained to be kept and performed by the parties hereto, it is

mutually agreed that said Track shall be maintained and operated under

the following terms, covenants, and conditions:

1. The term "Track" as used herein shall designate the plural
number if there is more than one track, and shall include all appurtenances
thereof, consisting of rail and fastenings, switches and frogs complete,
bumpers, ties, ballast, roadbed, embankment, trestles, culverts, and
any other structures and things necessary for the support of and entering
into the construction of said Track, and if said Track, or any portion thereof,
is located in a thoroughfare, said term "Track" shall include pavements,
culverts, drainage facilities, and all other work required by lawful authority
or agreed to by Industry in connection with the construction, renewal,
maintenance, and operation of said Track.

2. .Industry will secure and furnish, at its expense, all necessary franchises and permits and right-of-way beyond the premises of Railroad for the maintenance of said Track and for the operation of locomotives, motors, trains, and cars thereon and thereover, except in the event that any public body from which it is necessary to obtain franchises or permits shall require that the application be made by Railroad, then application therefor shall be made by Railroad on behalf of Industry. In the event Railroad applies for and secures said franchises or permits, Industry expressly agrees to pay any and all expenses incurred by Railroad in obtaining said franchises or permits, and all sums which may be expended at any time or times by Railroad under the provisions of said franchises or permits.

3. The tracks shown on the attached print between points A and B, points B and C, and points D and E are the subject of that certain agreement between Cotton Belt and Industry dated September 1, 1963 (Cotton Belt's Document Audit No. T-7050). Said agreement is hereby terminated as of the date hereof insofar as it covers the two tracks shown by mauve lines between points A and B, but will continue in full force and effect insofar as it covers the two uncolored tracks between points B and C, and points D and E (which are shown by green lines on the print attached to said agreement and measure 926.4 feet in total length).

That other agreement between Cotton Belt and Industry dated October 22, 1964, which supplements said agreement dated September 1, 1963, and provides for third party use by Jonesboro Grain Drying Cooperative of Industry's tracks, is hereby terminated as of the date hereof.

The track shown between points F and G is the subject of that certain agreement between Cotton Belt and Jonesboro Warehouse Industries, Inc., dated April 15, 1955 (Cotton Belt's Document Audit No. T-7065), as supplemented on September 30, 1957, and July 13, 1960, and as amended by letters dated November 28, 1962, and February 28, 1969. Industry hereby warrants that it is now the lawful owner of all the right, title, and interest formerly of Jonesboro Warehouse Industries, Inc., in and to said track and agreement. Said basic, supplemental, and letter agreements dated April 15, 1955, September 30, 1957, July 13, 1960, November 28, 1962, and February 28, 1969, are hereby terminated as of the date hereof.

The track shown between points H and I is the subject of that certain agreement between Cotton Belt and Jonesboro Grain Drying Cooperative dated May 23, 1969 (Cotton Belt's Document Audit No. T-7068). Industry hereby warrants that it is now the lawful owner of all the right, title, and

interest formerly of Jonesboro Grain Drying Cooperative in and to said track and agreement dated May 23, 1969; said agreement is hereby terminated as of the date hereof.

4. Cotton Belt owns and, at its expense, shall maintain the tracks shown by solid red lines (hereinafter collectively termed "solid red tracks"), measuring approximately 4,701.4 feet in total length.

Frisco owns and, at its expense, shall maintain the tracks shown by orange lines (hereinafter collectively termed "orange track"), measuring approximately 2,396.2 feet in total length.

Cotton Belt and Frisco jointly own and, at their joint expense, shall maintain the tracks shown by dashed red lines (hereinafter collectively termed "dashed red track"), measuring approximately 992.7 feet in total length.

Industry owns and, at its expense and to the satisfaction of Railroad, shall maintain the tracks shown by mauve lines (hereinafter collectively termed "mauve track"), measuring approximately 8,470.5 feet in total length.

5. Part of the mauve track is new, approximately 6,321 feet in length. Industry, at its expense and to the satisfaction of Railroad, shall arrange for the construction of said new trackage (including 3 turnouts) and the adjustment of existing utilities.

6. Industry will grant to Railroad, without charge and concurrently with the execution of this agreement, an easement satisfactory to Railroad for railroad, transportation, and communication purposes over, across, and along the right-of-way underlying the dashed red track, the orange track, and the 626-foot and 534-foot solid red tracks. Upon request of Railroad, Industry will furnish a legal description of said right-of-way, and will execute all instruments to evidence such easement.

7. Cotton Belt alone shall serve Industry's so-called "Old Mill" site and Frisco alone shall serve Industry's so-called "Old Delta" warehouses. Cotton Belt and Frisco will jointly serve the "New Mill" trackage.

8. Cotton Belt and Frisco shall, between themselves, enter into a separate agreement covering the operation of the solid red track, orange track, and dashed red track, and their joint service to Industry.

9. Subject to the next succeeding paragraph, Railroad may, but shall not be obligated to, maintain any segment of Industry's portion of said Track located on Railroad's land and/or any automatic warning devices.

Industry, upon request of Railroad and before any work to be done hereunder by Railroad at the expense of Industry is commenced, shall deposit with Railroad the estimated cost of said work. If the actual cost thereof shall prove more or less than said deposit, the difference shall be promptly paid by Industry or refunded by Railroad, as the case may be. If Railroad shall perform any work hereunder which Industry is obligated to perform or pay for without first obtaining deposit from Industry, Industry agrees to pay Railroad the cost of said work promptly upon receipt of bills therefor.

Prior to performing any work on Railroad's premises, Industry shall give Railroad's Division Engineer five (5) days' written notice, and, upon request, provide Railroad with certified copy of insurance policies in form and amounts satisfactory to Railroad, insuring Industry's and Railroad's liability for any bodily injury or property damage sustained in connection therewith. Said insurance shall be subject to termination only upon ten (10) days' written notice to Railroad. Any contractor performing any of such work for Industry shall be required by Industry to execute Railroad's standard form of contractor's right of entry permit before commencing such work.

In the event Industry desires, at any time prior to the termination of this agreement, to construct additional trackage extending or diverging from its portion of said Track, the construction of such additional trackage shall be in accordance with plans and specifications which shall be subject to the prior approval of Railroad. Unless otherwise agreed upon, such additional trackage shall form part of said Track.

10. Notwithstanding the provisions of Section 9 hereof, all material on said Track furnished at the expense of Railroad and not paid for by Industry, whether in original construction or by way of replacements or repairs, shall be and remain the exclusive property of Railroad. In the event said Track is disconnected, or upon termination of this agreement, Railroad may recover from the land of Industry all the material owned by Railroad, and Industry, provided no default shall then exist as to any covenants or agreements to be kept and performed by Industry, may recover all material owned by Industry and located on land of Railroad; provided, however, that Railroad, at its option, may perform at the sole cost and expense of Industry all work of dismantling, taking up, and removing all material owned by Industry and located on land of Railroad, and of placing the land in its original condition. If said Track, or any portion thereof, is located in a thoroughfare, Industry

will pay the cost of removing all material owned by Industry and restoring the thoroughfare to good condition, satisfactory to the proper lawful authority. Notwithstanding anything to the contrary herein contained, Railroad shall have the right at any time to purchase at its then value any or all material in said Track owned by Industry and not located on land of Industry.

11.  Railroad agrees to operate said Track for the purpose of serving Industry, unless prevented due to labor dispute or any cause beyond the control of Railroad, subject to any lawful charges that may be made by Railroad for such services. Railroad shall have the right to use said Track when not to the detriment of Industry. If said Track is an extension of or diverges from trackage not owned by Railroad, Railroad's obligation to serve Industry shall be subject to any restrictions on operations on such trackage, and to the continued existence in place and maintenance of such trackage.

12.  Industry is hereby permitted, during the term of this agreement, to operate over the solid red track, orange track, and dashed red track for purposes of delivery or receipt of cars shipped by or consigned to it. Railroad shall deliver cars to or receive cars from Industry on said tracks subject to any lawful charges that may be made by Railroad for such service.

13.  It is understood that the movement of railroad locomotives involves some risk of fire, and Industry assumes all responsibility for and agrees to indemnify Railroad against loss or damage to property of Industry or to property upon its premises, arising from fire caused by locomotives operated by Railroad on said track or in its vicinity for the purpose of serving Industry, except to the premises of Railroad and to rolling stock in its possession, and to shipments in the course of transportation.

Industry also agrees to indemnify and hold harmless Railroad for loss, damage or injury from any act or omission of Industry, Industry's employees or agents, to the person or property of the parties hereto and their employees, and to the person or property of any other person or corporation, while on or about said track, and if any claim or liability other than arising under Sections 16 and 18 shall arise from the joint or concurring negligence of Railroad and Industry, it shall be borne by them equally.

14.  Industry agrees that:

Industry will comply with clearance regulations prescribed by the public body having jurisdiction in the matter and with walkway standards as delineated on the chart attached, marked Exhibit "A-1" and hereby made a part hereof.

A minimum overhead clearance of twenty-seven (27) feet, measured vertically above tops of rails, shall be observed for wires over or across any track and for a distance of at least eight (8) feet six (6) inches from the center line of such track; subject, however, to statutes or orders of competent public authority having jurisdiction in the premises.

If, by statute or order of competent public authority having jurisdiction in the premises, greater clearances or other standards than those prescribed shall be required, Industry shall strictly comply with such statute or order.

All doors, windows or gates of any building or enclosure shall be of the sliding type or shall, when opened, be swung away from the Track when such building or enclosure is so located that said doors, windows, or gates if opened toward the Track would, when opened, be at clearances in violation of the clearances prescribed.

Notwithstanding anything herein contained, no structure, material, pole, cable, wire, conduit, pipe, opening, excavation or obstruction of any kind or character shall be erected, piled, made, stored, or maintained by Industry upon or over the premises of Railroad or beneath any track upon the premises of Railroad, without the written consent of Railroad first had and obtained. Further, no pipe, pole, wire, conduit, underground structure, opening, or excavation of any kind whatsoever shall be made or placed beneath any track, or within ten (10) feet thereof, beyond the premises of Railroad without first giving Railroad written notice thereof.

Industry shall at all times keep the pathway for trainmen and the walkway as prescribed and as shown on Exhibit "A-1", and the area between the rails free and clear of debris and/or obstructions of any kind or nature and whether due to the operations of Industry or Railroad, or both, or to the loading or unloading of cars on said Track. The indemnification hereinafter provided for in this section shall apply whether or not Railroad has notice or alleged notice of any violation by Industry of Industry's duty to keep said area clear of debris and obstructions.

Industry agrees that under no circumstances shall any gunpowder, dynamite or other explosive material be piled or stored by Industry or others upon the premises of Railroad.

Prior to using said Track for loading, unloading or storage of flammable liquid with flash point at or below 100 degrees Fahrenheit, nonflammable compressed liquefied gas, flammable compressed gas or other regulated hazardous material, Industry shall first secure the written permission

of Railroad for the specific material or materials.  Industry shall comply
with Railroad's rules governing, which will be furnished by Railroad to
Industry upon request.

In the event of leakage or spillage, Industry shall, at its own
expense, promptly clean Railroad's premises to the satisfaction of Railroad,
the Environmental Protection Agency and/or any public body having juris-
diction in the matter.  Should any such leakage or spillage result in a fine,
penalty, cost or charge being suffered or incurred by Railroad, Industry
shall promptly and fully reimburse and indemnify Railroad for or on account
thereof.

Industry agrees to indemnify and save harmless Railroad from
all loss, damages, penalties, costs or judgments that may be assessed
against or recovered from Railroad on account of or in any manner growing
out of the violation of this section.  The term "Railroad" as used in this
paragraph shall include the affiliated companies of Railroad and any other
railroad company operating on said Track with the consent of Railroad.

15.  If required, Industry shall, at its expense and to the satisfaction
of Railroad, install and maintain derail or derails on Industry's portion of
said Track.

16.  Industry is hereby permitted to move cars by means of its own
engine and trackmobile not only over the mauve track but also over any of
the solid red track, orange track, and dashed red track; provided, however,
that whenever Railroad is operating or about to operate on any of said tracks,
Industry shall move said engine or trackmobile from that particular track to
such location as to provide for said track the clearances prescribed herein,
and shall clear such track of all cars as to give an unobstructed area for
switching operations; provided, further, that Industry shall not at any time
leave any cars standing on such portion of any of said tracks as to impair
the prescribed clearances for the adjacent track.

The operation of said engine or trackmobile by Industry shall
be subject to all applicable federal and state laws, and all applicable rules,
regulations, and orders promulgated by any municipality, board, commission,
or governmental agency having jurisdiction in the matter.  Should any violation
by Industry of such applicable laws, rules, regulations, and orders result in
a fine, penalty, cost, or charge being suffered or incurred by Railroad,
Industry shall promptly and fully reimburse and indemnify Railroad for and
on account thereof.  Industry shall indemnify, protect, and save harmless
Railroad from and against all loss, damages, cost, and expense and consequence
of death of or injury to persons whomsoever, and loss or destruction of or

damage to property whatsoever and to whomsoever belonging, in any manner caused by, resulting from, or incidental to the existence, maintenance, use or operation of engine or track mobile, or the movement by Industry, its agents, servants or employees, of any car or cars on track, or Industry's failure to place and keep engine and track mobile as hereinabove provided, or by reason of Industry's failure to set the brakes or block the wheels of any car or cars after movement thereof by Industry, its agents, servants or employees regardless of the negligence of Railroad.

17. In the event there is installed or used a gate, fence on premises of Railroad, door, unloading pit, scale, car-moving device (other than one covered by Section 16 above), or any loading or unloading device across, over, beneath, on, or adjacent to said Track, Industry shall, whenever said facilities are not in use and when Railroad is operating or about to operate on said Track, cover, open, remove or retract and securely fasten such facilities to such position as to provide clearances prescribed herein and align the deadrail, if any, of said scale with said Track so as to permit operation by Railroad thereover or shall install an operating limit sign if the scale will not permit operation thereover by Railroad. Said facilities shall be installed and maintained by Industry, at its own expense and to the satisfaction of Railroad, and in conformance with any ordinance, rule, or regulation of any public body having jurisdiction in the matter. Said facilities shall not be installed across, over, on or adjacent to trackage of Railroad or beneath said Track, nor shall any door be installed across said Track without the prior written approval of Railroad.

Said gate or door may be opened and fastened by employees of Railroad or of Industry as their local representatives may from time to time agree; provided, however, that Railroad shall not be obligated to open said gate or door, and, upon request of Railroad, Industry shall open and fasten said gate or door as herein provided.

In lieu of covering said pit as herein provided, Industry may install and maintain such grill cover thereover as may be approved by the public body having jurisdiction in the matter.

Industry hereby releases and agrees to indemnify Railroad, its agents, successors, and assigns, from all liability, cost, and expense (including, but not limited to, loss of or damage to the property of either party and injury to or death of agents or employees of either party) resulting from the construction, reconstruction, presence, maintenance, use, or removal of said gate, fence, door, unloading pit, car-moving device (other than one covered by Section 16 above), scale, or loading/unloading device,

-8-

except when due to the sole negligence of Railroad. Industry further releases and agrees to indemnify Railroad from any liability, cost, or expense resulting from failure or alleged failure of the representatives of Railroad to close said gate. The term "Railroad" as used in this paragraph shall include the affiliated companies of Railroad and any other railroad company operating on said Track with the consent of Railroad.

Should it become necessary at any time in the future, due to changes in said Track, or for any other reason, to remove, reconstruct, alter or change the location of said facility or facilities, Industry shall, at its own expense, make such changes as may be necessary.

Upon termination of this agreement, Industry shall promptly remove said facilities from Railroad's premises and restore said premises at its own expense and to the satisfaction of Railroad.

18. A. Industry may, at its sole cost and expense, and for its sole convenience, construct, maintain, and use the road crossings that cross Industry's portion of track at the points shown on print. Industry shall indemnify, protect, and save harmless Railroad from and against all loss, damages, cost, and expense in consequence of death of or injury to persons whomsoever, and loss or destruction of or damage to property whatsoever and to whomsoever belonging, in any manner arising out of, caused by, resulting from or incidental to the construction, maintenance, existence or use of Industry's road crossings regardless of the negligence of Railroad.

B. Industry agrees to post or place octagonal stop signs at each road crossing of track. Industry further agrees to place one such octagonal stop sign on each side of track at each road crossing. Industry further agrees that each octagonal stop sign is to be reflectorized or constructed of a reflective material so that it is easily discernible by vehicular traffic at night.

19. Railroad may rearrange or reconstruct the Track or modify the elevation thereof whenever necessary or desirable in connection with the improvement of its property or changes in its tracks at or near the location of said Track; provided that Industry shall continue to have similar trackage, without additional cost to Industry. In the event, however, that a rearrangement or reconstruction of the Industry's portion of said Track, or modification of the elevation thereof, is required by reason of or as a result of any law, ordinance, order, permit, regulation, or other public enactment, or by reason of the happening of any contingency over which Railroad has no control, then Industry shall bear the cost of such rearrangement, reconstruction, or modification. Nothing in this section contained shall in any way affect the right of Railroad to terminate this agreement under the conditions hereinafter set forth.

20. Railroad shall have the right to disconnect said Track or refuse to operate over same, and in either case this agreement at the option of Railroad shall terminate in the event that (a) Industry shall cease to do business on said Track in an active and substantial way for a continuous period of one (1) year, unless prevented from so doing by law, strikes, or any causes beyond the control of Industry; (b) Industry shall fail to observe and perform each and every covenant and promise herein contained which is by Industry to be observed and performed; or (c) Railroad is required or authorized by law, ordinance or police regulation, or order of any lawfully constituted public authority having jurisdiction in the premises, to discontinue operation of said Track, or to change its tracks in such manner as to render it impracticable, in the judgment of Railroad, to continue to operate said Track.

21. This agreement is not to be construed as extending, altering, amending, modifying, or forming part of any instrument in writing between the parties hereto, or their predecessors or successors in interest, with respect to the use by Industry, or its successors in interest, of any premises of Railroad or its lessor.

22. This agreement is made in full contemplation of all applicable restrictive orders and regulations of the United States Government now or hereafter in effect, and, accordingly, it is expressly conditioned upon the ability of Railroad, after active endeavor in which Industry shall fully cooperate, to secure and furnish labor and materials and to secure any necessary authority to perform the work.

23. In order for Industry to properly assume responsibility for and control cars placed on said Track, Railroad hereby leases to Industry for construction, maintenance, and use of said Track the premises of Railroad underlying Industry's portion of said Track.

24. The effectiveness of this agreement shall be contingent upon the execution of the agreement mentioned in Section 8 above and the easement mentioned in Section 6.

25. The term "Railroad" as used herein shall refer to Cotton Belt and Frisco, jointly and severally.

26. This agreement shall be binding upon the heirs, executors, administrators, successors, and assigns of the parties hereto.

STATE OF CALIFORNIA
City and County of San Francisco } ss.

On this *1ST* day of *DECEMBER* in the year One Thousand Nine Hundred and Seventy *SEVEN*
before me, ROBT. J. BUSHNER, a Notary Public in and for the City and County of San Francisco, State of California, personally appeared
(One Market St.)

*L. D. BLAKE* AND *T. F. O'DONNELL*

known to me to be the *MANAGER CONTRACT DEPT AND*
*ASSISTANT SECRETARY*
of the corporation described in and that executed the within instrument, and also known to me to be the person s who executed it on behalf of the corporation therein named and __ he acknowledged to me that such corporation executed the same.

   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal at my office in the City and County of San Francisco, the day and year in this certificate first above written.

Notary Public in and for the City and County of San Francisco, State of California.

ROBT. J. BUSHNER
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL PLACE OF BUSINESS IN
CITY AND COUNTY OF
SAN FRANCISCO
My Commission Expires July 11, 1978

Corporation

My Commission Expires July 11, 1978

IN WITNESS WHEREOF, the parties hereto have executed this

agreement, in triplicate, the day and year first above written.

ST. LOUIS SOUTHWESTERN
RAILWAY COMPANY

By _____

Title:    Manager, Contract Dept.

ATTEST:

ASSISTANT Secretary

ST. LOUIS - SAN FRANCISCO
RAILWAY COMPANY

By _____

Title: SENIOR VICE PRESIDENT OPERATIONS

ATTEST:

Asst. Secretary

ARKANSAS RICE GROWERS
COOPERATIVE ASSOCIATION,
d/b/a Riceland Foods

By _____

Title: _____

ATTEST:

Secretary

12-27-77

Form Approved:

Madeleine E Sloane

Attorney

# EXHIBIT A-I
## ( STATES OTHER THAN CALIF., ARIZ., OREGON)

CS3595(4)



**NOTES**

1. For roadbed details see drawing CS500,513 or 515

2. Tie level walkways shall be provided adjacent to all yard tracks, turnouts, and portions of industrial tracks where trainmen normally work on the ground.

3. At turnouts and car spots tie level walkways shall extend minimum distance of 50' in advance of the point of switch and beyond the clear point and on each side of the car spot, where applicable.

4. Walkway approaches and transition slopes shall not exceed 1 to 8.

**LEGEND**

▨ Tie Level Walkway

▨ Subgrade Level Walkway

**REQUIREMENTS FOR WALKWAYS
ADJACENT TO TRACKS**
STATES HAVING NO REGULATIONS

Pine Bluff – May 12, 1978

125-137-A

Mr. A. A. Shapiro, Manager
Central Services, REIMIS
One Market Plaza, Room 507
San Francisco, CA 94105

  Attached for REIMIS input is original SSW Document Audit No.

T-7208, between St. Louis Southwestern Railway Company, St. Louis San

Francisco Railway Company and Arkansas Rice Growers Cooperative Assoc-

iation dba Riceland Foods.

  This agreement covers trackage serving industry at Jonesboro,

Arkansas, Mile Post TCT-125.26-R.

          J. W. Blasingame

WEH/rb
Attach.

cc: W. F. Reed
  L. J. Reddick
  L. R. Harris

# iSi
# FLASH

## Blueprint

### Document # +7208

### Box# 7256



INFORMATION SYSTEMS INC
10924 JOHN GALT BLVD.
OMAHA, NE 68137
(402) 339-6111